UNITED STATE DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ANTOINETTE DIXON, as Personal
Representative of the Estate of
ROBERT L. DIXON,

    Plaintiff,

Case No.: 8:15 CV 1806-T-23-JSS

v.

NYK REEFERS LTD., a foreign
corporation, COOL CARRIERS AB,
a foreign corporation, and
NYK COOL AB, a foreign corporation,

    Defendant.
_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COMES NOW, Plaintiff, ANTOINETTE DIXON, as Personal Representative of the Estate of ROBERT L. DIXON, deceased, by and through her undersigned counsel, pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 3.01(b), and files her Response in Opposition to Defendants' Motion for Summary Judgment, and in support thereof states:

### MEMORANDUM OF LAW[1]

Defendants' Motion for Summary Judgment should be denied because there exists genuine disputes of material facts, and because the applicable law does not entitle Defendants to judgment as a matter of law.

---

[1] Defendant's Motion for Summary Judgment is premature. Only one liability expert has been deposed (the transcript of which is not yet available), and two additional liability experts' depositions are scheduled to take place on July 8, 2016 and July 11, 2016. Thus, vital testimony regarding the issue for which Defendant's seek summary judgment is still outstanding.

## I. STATEMENT OF FACTS[2]

On May 14, 2012, the cargo vessel M/V Wild Lotus (hereinafter "Wild Lotus" or "the vessel") docked at Port Manatee, Florida for discharge of its cargo, primarily consisting of pallets of pineapples and bananas belonging to Del Monte Fresh Produce. (Bates, 9:11-15). The vessel contained four holds, each hold with an opening on the deck to allow for loading and unloading, referred to as a "hatch." (Doster, 11:13–17; Englehart, 23:20–22). On May 14, 2012, Mr. Dixon and the other longshoremen with whom he was working (referred to as a "gang") were assigned to hold #2 of the Wild Lotus. (Doster, 24:14–19). A longshoreman gang, *when staffed appropriately*, consists of four forklift operators, one lander, one header, and two crane operators, for a total of eight men per gang on the vessel. (Bates, 17:23–18:5; Englehart 12:14–19). The "header" is the person responsible for directing the gang and making decisions regarding the operation. On May 14, 2012, the header of the gang to which Mr. Dixon belonged was Henry Archie, and the gang was referred to as the "Archie gang." (Bates, 18:14–20; Archie, 11:9-11; Lewis, 15:18–16:4; Smith, 13:8–16; Mack, 14:17–15:3). Mr. Dixon was not the header. Although Mr. Archie was the acting header, he was not present on the vessel when the incident occurred. (Archie, 9:11–19; Affidavit of John Sullivan, ¶12(i), attached as Exhibit 1).

The Archie gang, in addition to not having a header, was also operating without a lander. By all accounts, the lander of the Archie gang was being used as a "break guy." (Garfield, 33:5–9; Mack, 22:13–23:19; ). Each forklift driver (there are four) would take a one hour break. When the "break guy" came back into the hold after his hour break, he would relive the next forklift driver, and the relieved driver would then take his hour-long break. (Doster, 22:22–25). If done

---

[2] Defendant's statement of "undisputed" facts are hardly undisputed, thus Plaintiff has included a Statement of Facts. In reviewing a Motion for Summary Judgment, the facts and inferences therefrom must be construed in the light most favorable to the non-movant, the Plaintiff.

properly, instead of acting as a "break guy," the fifth guy in the hold should be working to clear the deck, as well as acting as a flagman to communicate with the crane operator. (Doster, 22:7–13). Because of this ad hoc break system, on May 14, 2012 the Archie gang was operating with only four men working in the hold at any given time, as the header was absent and the lander was being used as a "break guy." Notably, according to the members of the Archie gang, it is the lander that acts as a flagman/signalmen to communicate with the crane operator. (Doster, 22:7–13; Lewis, 9:19–24).

In addition to having no visual communication between the hold and the crane via a signalman, the Archie gang's operation was also being conducted without any radio communication. When done correctly, both the crane operator and the gang's header have radios in order to communicate should the need arise. (Bates, 47:1–10). On the day that Mr. Dixon was killed, the person working in the hold that would have had a radio to communicate with the crane operator would have been Henry Archie had he been present. (Bates, 47:11-16). The crane operator testified that he did not have a radio at all. (Watson, 26:10–12). Thus, there was absolutely no radio communication between the hold and the crane.

In order to offload cargo aboard the Wild Lotus, the crane operator lowers a 5500 pound steel cage into the hold for the longshoremen to load the pallets of fruit using forklifts. (Lewis, 25:23–26:7). Because the bottom of the cage was solid steel, it created a blind spot for the crane operator as the cage was being lowered into the hold, meaning the crane operator could not see into the hold below the cage where the longshoremen, including Mr. Dixon, were working. (Bates, 54:18-55:2; 60:6-11; Watson, 42:17–43:11). Even the Captain of the vessel, Captain Dovbna, testified that a flagman is necessary "if the crane operator doesn't have unrestricted visibility regarding the site where the cargo is being lifted down." (Dovbna, 66:9–18).

After approximately one hour into the offloading process in hold #2, it was time for the "break guy" to relieve one of the forklift drivers for their one-hour break. (Garfield, 31:17–25). The first "break guy" was Garfield Lewis, and he was relieving Mr. Dixon. (Garfield, 31:17–22; 33:5–13). As Mr. Dixon was leaving hold #2, Brunson Mack, another forklift driver, stalled his forklift—and did so in the landing zone of the open hatch area. (Mack, 38:7-8; 46:8–13; 47:12–16). Importantly, the forklifts being used aboard the Wild Lotus required a key card to start them. (Mack, 38:5-12). Mr. Mack was unaware of the key card requirement, and could not get his forklift to start despite his efforts. (Mack, 38:9-12). Accordingly, Mr. Mack was stranded in the middle of the landing zone, exposed to the danger of the cage being lowered on top of him. (Mack, 38:5–12).

In an effort to rescue Mr. Mack, Mr. Dixon ran into the open hatch area in order to use his own key card to re-start the stalled forklift. (Mack, 38:13-15). Immediately after swiping his card to allow Mr. Mack to move, the 5500 cage was dropped onto Mr. Dixon causing his fatal injuries. (Mack 38:17–39:20). According to Mr. Mack, he, his "big yellow" forklift, and Mr. Dixon were located "in the middle of the landing area." (Mack, 47:12–16). Neither Mr. Mack nor Mr. Dixon were given any warning whatsoever that the cage was being lowered on top of them. (Mack, 46:5–8).

Despite Defendant's assertions that no crew was present at the time Mr. Dixon was killed, Captain Dovbna testified that "there are two crew members always [] present for monitoring of cargo operations at main deck." (Dovbna, 78:15–18). Captain Dovbna further acknowledged that the crew of the vessel is responsible for the vessel at all times, and that the crew has a duty to intervene if the cargo operations become unsafe. (Dovbna, 81:7–17 and 84:25–85:2). In fact, if the Captain or his crew become aware of dangerous operations, they should "demand the termination

4

of the cargo operations being carried out." (Dovbna, 35:14–25)

## II. THE ISSUES TO BE DECIDED BY A JURY

There are several genuine disputes of material fact that must be resolved by a jury including whether Mr. Dixon was acting as header on the day that he was killed (and whether its permissible for the actual Header to be absent during cargo operations), whether a flagman is necessary during cargo operations, whether a warning system is necessary, whether there was communication between the longshoremen and the crane operator, whether it is appropriate for the lander to act as a "break guy," whether the crane operator had clear visibility, why Mr. Dixon was in the open hatch area, whether members of the crew were present during cargo operations, and ultimately whether the cargo operations aboard the Wild Lotus were sufficiently dangerous so that the Captain and crew of the vessel should have intervened and halted operations until such time the dangerous conditions were rectified. These issues are obviously factual, material, and in genuine dispute between the parties. Therefore, summary judgment is not appropriate, and this case must be resolved by a jury.

## III. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *F.R.C.P.* 56(a). The movant bears the heavy burden of establishing that there is no dispute of material fact and that it is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). When reviewing a motion for summary judgment (and any response thereto), the court must view the facts and inferences in the light which is most favorable to the non-movant. *United States v. Gilbert*, 920 F.2d 878 (11th Cir. 1991). If the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then summary judgment shall be denied. *Liberty Lobby,*

477 U.S. at 250–252.

## IV. ARGUMENT

### a. **The vessel had a duty to intervene**

Section 905(b) of the Longshore Harbor Workers Compensation Act ("LWHCA" or the "Act"), permits a longshoremen to recover for "injury...caused by the negligence of the vessel." 33 U.S.C. § 905(b). With the 1972 Amendments, Congress intended to place the injured longshoreman "in the same position he would occupy if he were injured ashore during non-maritime employment." *Mallard v. Aluminum Co. of Canada, Ltd.*, 634 F.2d 236, 243 (5th Cir. 1981). Congress, through passage of the 1972 Amendments, did not intend to derogate from the maritime law imposing liability on a vessel owner whose officers see or have actual visual notice of, or ample time to observe, unsafe stevedoring operations and do not take corrective action." *Id.* at 244 (citing *Slaughter v. Ronde*, 390 F.Supp. 637 (S.D. Ga. 1974), aff'd, 509 F.2d 973 (5th Cir. 1975). The Act, however, does not specify the standards to use to gauge whether a vessel's conduct is negligent. Instead, whether the conduct of the vessel constitutes negligence was left for the courts to resolve. *Kirsch v. Plovidba*, 971 F.2d 1026, 1028 (3d Cir. 1992) (citing *Scindia*, 451 U.S. at 165–166). While the *Scindia* Court helped to define three specific duties of the vessel, the general principle is that "the vessel owes to the stevedore and its longshore employees a duty to exercise due care under the circumstances." *Id.* The duty owed is similar to the duty that a landowner owes to his or her invitees, as explained in the Restatement of Torts (Second), Sections 343 and 343A. *Id.*; *Gill v. Hango Ship-Owners/AB*, 682 F.2d 1070, 1073–1074 (4th Cir. 1982). As it relates to the duty to intervene, this means that where the stevedore conducts its operation in a manner that makes the Plaintiff's injury reasonably foreseeable, the vessel, if it fails to intervene, may be held liable for those injuries. *Id.* at 1074–1075. The vessel does not escape liability for

injury merely by agreeing to relinquish control of the work area to the stevedore (as Defendants seem to suggest)—such result would "thwart Congress' intent to retain a negligence action against the vessel owner." *Mallard*, 634 F.2d at 243.

Where the stevedore continues its cargo operations in a dangerous manner, "present[ing] an unreasonable risk of harm to the longshoremen," the vessel has a duty to intervene in the operation until such time the unreasonable risk to the longshoremen has been alleviated. *Scindia Steam Nav. Co., Ltd. v. De Los Santos*, 451 U.S. 156, 175–176 (1981). Contrary to Defendant's explanation of *Scindia*, the standard of care adopted by the Supreme Court imposes a *greater* duty on the shipowner than does the Restatement (Second) of Torts, Sections 343 and 343A. *Gill*, 682 F.2d at 1074. Consequently, "the [vessel] owner owes a duty of care at least as stringent as that imposed by the Restatement and, in certain circumstances, a greater one." *Id.* The *Gill* Court explained that the vessel is liable to the longshoreman if it fails to "prevent harm that may result from an obviously improvident failure of the stevedore to take proper precautions in the face of an obvious and unreasonably dangerous defect." *Id.* Whether the conditions existing during the cargo operations were such that the vessel's duty to intervene was triggered is a question of fact for the jury to determine, and should not be determined as a matter of law. See *Scindia*, 451 U.S. at 178 (stating that it is a jury issue "as to whether it was so unsafe that the stevedore should have [ceased operations]").

In *Gill v. Hango*, 682 F.2d 1070, the Fourth Circuit Court of Appeals held that when the stevedore continues to conduct its cargo operations in a manner which is unsafe, risk of injury is reasonably foreseeable and it is a "jury issue as to whether [the vessel] should have intervened to stop the loading operation until it could be done with reasonable safety." 682 at 1075 (citing *Scindia*, 451 U.S. at 178). The *Gill* Court opined that the duty imposed on shipowners by *Scindia*

7

was greater than that of an ordinary landowner to his or her invitee in that the shipowner has an affirmative duty to intervene when cargo operations aboard the vessel are unsafe. *Id.* at 1074.

**The lack of signalman/flagman**

The cargo operations aboard the Wild Lotus on May 14, 2012 exposed the longshoremen in hold #2 to an unreasonable risk of harm, and the vessel's failure to intervene constitutes negligence. It is undisputed that the cargo operation in hold #2 was being conducted without the use of a flagman/signalman. Remarkably, Defendants assert in their Motion that there is no evidence that the cargo operation was being conducted in a dangerous manner. Plaintiff's expert, John Sullivan, in his affidavit opined that "the lack of a header (flagman or spotter) as a means of guarding against the hazard by signaling to the crane operator when a dangerous condition exists violated applicable industry standards and caused Mr. Dixon's death." (Sullivan Affidavit, Exhibit 1, ¶18). Further, Plaintiff's expert, Tom Bolcar, in his affidavit states that "[t]he use of a signal man is critical to the safety of longshoremen working in a crane operator's blind spots. The need for signalmen on reefer ships discharging using trays is **both imperative and standard.**" (Affidavit of Tom Bolcar, ¶16 attached as Exhibit 2).

Defendants on page 15 of their Motion, state that "there is no evidence of where a flagman would have been positioned on the deck and therefore no evidence that a flagman would have seen any more than the crane operator saw once the tray was swung over the hold." In direct contrast to that assertion, Captain Dovbna was asked (by Counsel for the Defendants) to draw arrows on Exhibit 39 to indicate "if a flagman was used [] at hold number 2 where would the flagman stand?" (Dovbna, 133:3–5). (See Exhibit 39 to Captain Dovbna's deposition, attached as Exhibit 3). When drawing his arrows, Captain Dovbna placed the flagman on the deck of the vessel, immediately adjacent to the hold—many feet below the crane operator's cabin and with a view from a different

8

angle. Furthermore, Michael Watson, the crane operator working the crane involved in Mr. Dixon's death affirmed the necessity of having a flagman by testifying that "I think a flagman would have made it as safe as I could ever get because that's my eyes behind my eyes, you know. So even when I can't see, he still going to let me know and give me enough time to correct...." (Watson, 51:16–23).

Defendants also assert on page 15 of their Motion that Logistec procedures did not require the use of a signalman, however, the Logistec General Procedures indicate the opposite is true:

> When the tray is overhead of the hatch *the Header signals the Crane Operator to slowly lower the cage* to shoulder height. The hanging tag lines can then be gripped by the Deck men to position the tray for landing safety on the deck. (The Deck men should never reach higher than shoulder level to grip any tag line / never at any time to allow the tray to be overhead of a person.)

(See Logistec General Procedures, Fruit Procedure/Loadback p.7, ¶17, attached as Exhibit 4).

In addition to the Logistec General Procedures, there are several national and international regulations that indicate the necessity of a flagman. The United Nations International Labor Organization ("ILO"), Safety and Health in Ports, ILO Code of Practice, Geneva (2005), Section 5.4.12 states: "Signalers should do their utmost to protect persons against accidents. When necessary, they should warn persons in cargo holds, on lighters and ashore." (Bolcar Affidavit, Exhibit 2, ¶10(h)). Section 5.4.9 states: "Signalers should not give an order before satisfying themselves that all measures have been taken to ensure that the operation can be carried out safely. The essential characteristics of signalers should be *ceaseless vigilance and awareness that appliance operators are totally dependent on them during operations outside the operator's line of sight*." (Bolcar Affidavit, Exhibit 2, ¶10(j)). According to Mr. Bolcar, who has 40 years of marine experience including as a stevedore manager involved in reefer ship cargo operations, the "[s]hip's officers and/or Rated Seamen had the responsibility to understand the proper operation

of the ship's cranes. They should have seen that there were no signal men at the start of the operation **and halted it until signal men were provided.**" (Bolcar Affidavit, Exhibit 2, ¶17).

### The lack of an audible and/or visual warning system

It is also undisputed that the crane being used in hold #2 was not equipped with an audible and/or visual warning system to inform the longshoremen when the cage was being lowered into hold above them. "The lack of an adequate means of an audible or visual warning alarm to alert the longshoremen in the hatch that the cage was being lowered violated applicable industry standards and caused Mr. Dixon's fatal injury." (Sullivan Affidavit, Exhibit 1, ¶18). Mr. Bolcar opined that "In addition to or in lieu of the crew making sure the operation was correct and ship shape, an automated or crane operator actuated system to warn people in the hold that a tray was being lowered would have likely prevented Mr. Dixon's death. The newest generation of fruit ships...have such a system consisting of both rotating lights and audible alarms. Del Monte, the company that owned the fruit the ship was transporting, has these warning devices on its newer ships." (Bolcar Affidavit, Exhibit 2, ¶19).

Occupational Safety and Health Administration ("OSHA") Regulations regarding overhead and gantry cranes also indicate the necessity for audible alarms on cranes[3]. Specifically, it states that "when the load or hook approaches near or over personnel, the warning signal shall be sounded." 29 C.F.R. 1910.179 (n)(3)(xi). Additionally, several internationally recognized regulations, including the Occupational Health and Safety Regulations ("OHS"), the International Maritime Organization ("IMO"), and the ILO contain provisions related to audible or visual

---

[3] John Sullivan testified during his deposition (transcript not yet available) that the regulations in 29 C.F.R. 1910.179 (regulating Overhead and Gantry cranes) are applicable to the cranes at issue. Further, the "application" section of that Code indicates that the regulations apply to other cranes "having the same fundamental characteristics." Mr. Sullivan cites to these regulations in his affidavit, which has been attached as Exhibit 1.

warning systems. (*See* Sullivan Affidavit, Exhibit 1).

Further, Michael Watson, the crane operator for hold #2 on May 14, 2012, testified that he had personally operated other cranes on reefer ships at Port Manatee that were equipped with a siren/horn for alerting longshoremen. (Watson, 47:11–48:10). Mr. Watson indicated that had he been operating a crane that had a siren/horn on the day Mr. Dixon was killed that he would have signaled to the longshoremen "each and every time before [he] lowered a load." (Watson, 50:7–21). Ultimately, Mr. Watson testified that "the best" system would be one with a "horn or a siren or strobe lights down in the deck to warn people [the tray] is coming down and a flagman." (Watson, 51:24–52:2).

### The lack of proper personnel

Lastly, in addition to having neither a flagman nor audible and/or visual alarms, the Archie gang was conducting the cargo operation in hold #2 with only four men in the hold, rather than the six men that were required. As explained above, the Archie gang's regular routine was to work without a lander, and instead employ the lander as a "break guy" so as to afford themselves additional break time. Presumably, when the Header (Archie) was not on another vessel, the Header could serve as the additional set of eyes and ears to ensure the safe operation of the gang. However, on May 14, 2012, the Header was not present. Therefore, the longshoremen working in hold #2 were doing so without its lander (flagman/signalman), and also without its header (the extra set of eyes). The result was a further exacerbation of the already-dangerous conditions in which the Archie gang was conducting its operation.

The combination of no signalman, no audible and/or visual warning system to alert longshoremen of the cage being lowered above them, no radio communication, and the absence of two members of the gang that were instrumental in facilitating communication between the

longshoreman and the crane operator, rendered the entire operation in hold #2 extremely dangerous and exposed the longshoremen to an unreasonable risk of harm. According to Mr. Bolcar, "The Master and Crew of the M/V Wild Lotus knew of should have known that the cranes being used during the cargo offloading operation were being used without any warning system (neither audible nor visual) to warn the longshoremen working in the hold that the cage was being lowered into the hold above them; ...knew or should of known that the stevedore operation in hold #2 was being conducted without the use of a flagman/signalman, rendering the operation unreasonably dangerous"; and ... "knew or should have known that the stevedore operation in hold #2 was being performed by a gang of longshoreman that did not include a header, rendering the operation unreasonably dangerous." (Bolcar Affidavit, Exhibit 2, ¶¶ 21, 22, 23). Allowing the operation to continue under these circumstances "is consistent evidence of a careless disregard for the safety and security of the vessel, her crew and the longshoremen working the cargo operations." (Sullivan Affidavit, Exhibit 1, ¶18).

While the existence of an injury is not, by itself, evidence of negligence, Mr. Dixon's death certainly demonstrates the dangerousness of the operation in hold #2 on May 14, 2012. Any one of the failures explained above would be sufficient to submit the question to a jury as to whether the vessel should have intervened and halted the operation; and, the combination of the several failures renders the operation exponentially dangerous exposing the longshoreman to the unreasonable risk of injury that could have—and should have—been remedied by the vessel.

Because the parties have a genuine dispute regarding these material facts, summary judgment is not appropriate, and the question should be resolved by a jury.

### b. "Customary" conduct can still be dangerous

In its Motion, Defendants rely heavily on the fact that the Archie gang had conducted cargo

operations aboard the Wild Lotus on May 7, 2012 (the week before), and had not used a signalman nor had an audible or visual warning system in place on that occasion. Defendant's argument that because the longshoreman had worked on the vessel one week prior that they "were familiar with the cranes and holds on this ship," (Motion p. 14), as if familiarity of the ship by the longshoremen somehow alleviates the vessel's duty to intervene. The (not so) subtle argument is that because there was no injury that occurred on May 7, 2012, the operation could not have been so dangerous so as to require the vessel to intervene.

In *Kirsch*, the Third Circuit Court of Appeals explained that the customary practice of the stevedore may be used to show that the vessel "should know that longshore workers frequently confront rather than avoid a type of obvious hazard." 971 F.2d at 1031. Under these circumstances, "the shipowner may be negligent in not eliminating the hazard." *Id.* In other words, the vessel cannot escape liability for its failure to intervene in dangerous cargo operations by asserting that because the operation is always done a certain way, it is permissible for the vessel to continue to permit that behavior—i.e. permitting cargo operations to continue without signalmen. The *Kirsch* court concluded that the vessel may be held liable for failing to correct an obvious hazard "when it should have expected that an expert stevedore could not **or would not** avoid the hazard and conduct cargo operations reasonably safely." *Id.* A stevedore's repeated decision to continue its operation by confronting the dangerous conditions rather than halting operations to avoid them is exactly why the Supreme Court imparts a duty on the vessel to intervene on the longshoremen's behalf.

Similarly, in *Gill*, the vessel owner asserted that the Plaintiff had worked for eight years doing the same work and only witnessed one other injury resulting from the harm to which he was exposed; and also that the method used during the cargo discharge was "customary in the industry."

*Gill*, 682 F.2d at 1074. The lower court granted summary judgment based, in part, on those arguments and finding that the harm to Plaintiff was not reasonably foreseeable. *Id.* On appeal, the Fourth Circuit rejected those arguments, stating that "an accident that is unprecedented or extraordinary is not necessarily unforeseeable...nor, is proof of adherence to an industry practice or custom dispositive on the issue of negligence. *Id.* The Court explained that "even if the stevedore was also negligent, [the vessel]'s liability is not foreclosed if the stevedore's decision [to continue its operation] was obviously improvident." *Id.* at 1075. The Court concluded that because there was a dispute about whether the cargo operation was unsafe, it created "a jury issue as to whether the [cargo operation] was so unsafe that the stevedore should have ceased," and also "a jury issue as to whether [the vessel] should have intervened to stop the loading operation until it could be done with reasonable safety." *Id.*

Here, Defendant's arguments that the Archie gang had conducted similar cargo operations one time before on the same vessel and that the Archie gang regularly unloaded cargo on the first deck without a flagman do not, in any way, effect the inquiry of whether the vessel should have intervened. Defendant's argument is essentially something akin to: "since they've always conducted the cargo operation dangerously, it was not negligent to continue to do so." As the *Gill* Court explained, "proof of adherence to an industry practice or custom [is not] dispositive on the issue of negligence." 682 F.2d at 1074. Instead, whether the conduct of the stevedore was such that it exposed the longshoremen to an unreasonable risk of harm so that the vessel had a duty to intervene is a determination for the jury.

### c. **Cool Carriers AB, as Time Charterer, is a proper party.**

Defendants rely on *Mallard* for the proposition that the time charterer of a vessel is not liable for injuries to Plaintiff because they are not involved in the operation of the vessel. In

*Mallard*, the Fifth Circuit Court of Appeals overturned summary judgment in favor of the Time Charterer and ordered that the claim proceed against both the vessel and the time charterer. 634 F.2d at 245. The only party dismissed from the suit in *Mallard* was a Canadian-based stevedore company because the Court held that Florida's Long-Arm Statute could not reach that defendant and so the court lacked personal jurisdiction. *Id.* at 241–242. Accordingly, the dismissal as to the Canadian stevedore was affirmed, however, the summary judgment in favor of the vessel and the time charterer granted by the trial court was reversed and the case remanded for further proceedings. *Id.* at 245. Therefore, *Mallard* supports Plaintiff's position that the time charterer is properly held liable under these circumstances and should not be dismissed from the suit.

## V. CONCLUSION

The operation aboard the Wild Lotus was being conducted with no signalmen, no warnings to the longshoremen as to when the cage was being lowered, and no radio communication between the longshoremen and the crane operator. Further, the Archie gang was operating without a header, and was utilizing its lander as a "break guy" rendering the cargo operation inside hold #2 two men short of what was required. The obvious result is that there was a complete lack of communication between the men working in the hold and the crane operator responsible for lowering the 5500 lb cage into the hold. Just as the *Gill* Court opined, whether these conditions are such that they constitute a situation "so unsafe that the stevedore should have ceased" and "the vessel should have intervened" are jury issues that cannot be decided as a matter of law. Accordingly, Defendant's Motion for Summary Judgment should be DENIED.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of July, 2016, the foregoing has been

served via electronic mail to **Timothy P. Shusta, Esquire**, 100 S. Ashley Drive, Suite 1900, Tampa, Florida 33602-5311; timothy.shusta@phelps.com; cathy.marcioni@phelps.com.

Respectfully submitted,

**FLORIN ROEBIG, P.A.**

*/s/*

**WIL H. FLORIN, ESQUIRE**
Florida Bar No.: 0337234
Primary:    WHF@FlorinRoebig.com
**SHAUN M. CUMMINGS, ESQUIRE**
Florida Bar No.: 0111944
Primary:    scummings@florinroebig.com
**FLORIN|ROEBIG, P.A.**
777 Alderman Road
Palm Harbor, Florida 34683
Telephone (727) 786-5000
Facsimile (727) 772-9833
Secondary:  SSchlesinger@florinroebig.com;
            piservice@florinroebig.com.
Attorneys for Plaintiff