UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


ANTOINETTE DIXON,

      Plaintiff,

v.                                     CASE NO. 8:15-cv-1806-T-23JSS

NYK REEFERS LTD., et al.,

      Defendants.

_____/


## ORDER

     A crane unloading cargo from the M/V *Wild Lotus* lowered a metal tray onto and killed Robert L. Dixon, a longshoreman working aboard the vessel. As personal representative of the deceased, Antoinette Dixon, Robert's wife, sues (Doc. 54) both NYK Reefers Ltd., which owns the vessel, and Cool Carriers AB, which chartered the vessel at the time of the incident. Antoinette sues under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 905(b), 933. The defendants move (Doc. 74) for summary judgment.


## BACKGROUND

     On May 14, 2012, four longshoremen gangs employed by Logistec USA reported to Port Manatee to unload the M/V *Wild Lotus*, which held a cargo of

bananas and which contains four cargo hatches.  Logistec assigned the "Archie" gang, on which Robert worked, to unload the second hatch.  Because cargo filled the hatch, the Archie gang initially removed pallets of produce without a forklift. After the longshoremen cleared space in the hatch, a crane lowered a forklift onto the hatch square, an area beneath the hatch opening.  The crane lowered the forklift with a 5,500-pound metal tray owned by Logistec.

The forklift loaded pallets onto the tray and the crane swung the tray onto the dock, where shore-side forklifts unloaded the pallets.  As the gang removed more pallets, Logistec lowered more forklifts into the hatch until four forklifts operated in the hatch.  The forklifts loaded pallets onto the tray, which sat on the hatch square. Once the tray filled, the crane lifted, swung, and placed the tray on the dock. After the shore-side forklifts cleared the tray, the crane operator again swung the tray onto the hatch square, and the process repeated.

A fifth longshoreman acted as a "break guy" for the four forklift drivers so that no forklift sat idle during the discharge.  Around 9:00 a.m., Robert went on break. As Robert began leaving the hatch, a forklift operated by Brunson Mack stalled in the hatch square.  To restart the forklift, a supervisor must swipe a key card.  Robert, a supervisor, ran to Mack and restarted Mack's forklift, but before Robert could leave the hatch square the tray landed on, and killed, Robert.

- 2 -

Antoinette sues (Doc. 54) the defendants[1] for negligence.  Antoinette argues that the absence of a flagman, a header, a warning system on the crane, and a radio link between Robert and the crane operator imperiled Robert and therefore triggered the defendants' duty to intervene and to halt the stevedore.  (See Doc. 83 at 6–9)  Citing *Scindia Steam Navigation Co. Ltd. v. De Los Santos*, 451 U.S. 156 (1981), the defendants argue that they breached no duty to Robert.

## DISCUSSION

Section 905(b) of the Longshore and Harbor Workers' Compensation Act provides a remedy against a vessel for negligence.[2]  Under Section 902, "vessel" includes both a vessel's owner and a charterer.  To prevail on a negligence claim, the plaintiff must show duty, breach, causation, and harm.  *Restatement (Second) of Torts § 281*.

In *Scindia Steam*, a winch aboard the vessel malfunctioned and caused a seventy-pound sack of wheat to fall on and to injure the plaintiff.  *Scindia Steam*, 451 U.S. at 159–61.  Interpreting a vessel's liability under Section 905(b), *Scindia*

---

[1] Because this order applies to both defendants and concludes that neither owed Robert a duty to intervene, the order draws no distinction between the owner and the time-charterer. However, the defendants correctly note that, to hold both the owner and the time-charterer liable for negligence, Antoinette must show an independent act of negligence by each.

[2] Section 905(b) states, "In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 . . . ."

*Steam* holds that a vessel owes a stevedore a "turn-over" duty, an "active operations" duty, and an "intervention" duty. *See Scindia Steam*, 451 U.S. at 167, 173–78.

Before surrendering the cargo to the stevedore, the vessel must ensure that the vessel and the vessel's equipment are reasonably safe, i.e. that an expert stevedore acting reasonably can "carry on cargo operations with reasonable safety to persons and property." *Scindia Steam*, 451 U.S. at 167. Also, the vessel must warn the stevedore of a non-obvious hazard about which the vessel knows or should know. *Scindia Steam*, 451 U.S. at 167.

If the vessel actively participates in the cargo's discharge and negligently injures a longshoreman, the vessel bears liability for negligence. *Scindia Steam*, 451 U.S. at 167.

Once the stevedore begins unloading cargo, the vessel generally "owes no duty to the longshoremen to inspect or [to] supervise the cargo operations." *Scindia Steam*, 451 U.S. at 172. But if the vessel learns (1) that defective equipment presents an "unreasonable risk of harm" to a longshoreman and (2) that the stevedore exercises "obviously improvident" judgment in using the defective equipment, the vessel must intervene to repair the defective equipment. *Scindia Steam*, 451 U.S. at 175–76. A stevedore exercises "obviously improvident" judgment by using equipment "so hazardous that anyone can tell that [the equipment's] continued use creates an

unreasonable risk of harm even when the stevedore's expertise is taken into account." *Greenwood v. Societe Franchise De*, 111 F.3d 1239, 1249 (5th Cir. 1997) (Garwood, J.).

In this action, Antoinette alleges only a breach of the duty to intervene. (*See* Doc. 51 at 4 ("The vessel . . . breached [its] duty to intervene by failing to take any action to correct the unsafe conditions . . . ."); Doc. 83 at 7–13)  Specifically, Antoinette states that the absence of a flagman and of a warning system to notify a longshoreman of the crane's activity combined to create an "unsafe condition." (Doc. 83 at 12–13)  Assuming that a dangerous condition not created by the vessel or the vessel's equipment can trigger the duty to intervene, Antoinette argues that the defendants should have recognized the unsafe condition and intervened to stop the stevedore.[3]  (Doc. 83 at 12)

Only a defect in the vessel or in the vessel's equipment creates a duty to intervene.  *Cf. Scindia Steam*, 451 U.S. at 177 (holding that a "necessary inquiry is whether pertinent statutes, regulations, or custom place . . . a continuing duty on the vessel to repair *defective ship's gear* being used by the stevedore in the cargo operation") (italics added).  A hazard attendant to the stevedore's alleged negligence imposes on the vessel no duty to intervene.

---

[3] Antoinette proffers an expert report of John Sullivan and of Tom Bolcar (Docs. 83-5, 83-6). On the question of the defendants' breach of the duty to intervene, neither report establishes a dispute of material fact. Rather, both reports offer conclusory statements of law. (*See, e.g.*, Doc. 83-6 at 4 (quoting *Scindia Steam*'s discussion of the "turn-over" duty in an attempt to explain why the defendants in this action breach the duty to intervene))

Although the Eleventh Circuit has not directly resolved the issue, *Cf. Clark v. Bothelho Shipping Corp.*, 784 F.2d 1563, 1565 (11th Cir. 1986) ("If . . . during stevedoring operations, the shipowner becomes aware that the ship or its gear poses a danger to the longshoremen . . ."), the weight of authority confirms that only a defect in the vessel or in the vessel's equipment creates a duty to intervene.  *See Derr v. Kawasaki Kisen K.K.*, 835 F.2d 490, 496 (3d. Cir. 1987) (Sloviter, J.) ("It is unlikely that the narrow duty of a ship to intervene to make repairs was intended to extend beyond defective conditions with respect to the ship, its equipment, and gear.") (citing *Hodges v. Evisea Maritime Co., S.A.*, 801 F.2d 678 (4th Cir. 1986) (Phillips, J.)); *Singleton v. Guangzhou Ocean Shipping Co.*, 79 F.3d 26 (5th Cir. 1996) (Davis, J.) (holding, in an action arising from the stevedore's improper use of a vessel's non-defective winch, that the vessel owed no duty to intervene).  *But see Gill v. Hango Ship-Owners/AB*, 682 F.2d 1070, 1074–75 (4th Cir. 1982) (Winter, J.); *In re Columbia Leasing, L.L.C.*, 991 F.Supp.2d 722, 738 n.12 (E.D. Va. 2014) (Davis, J.) (collecting authority to suggest that the duty to intervene extends beyond hazards in either the vessel or in the vessel's equipment).

The policy considerations that motivated Congress to pass the 1972 amendment to the Longshore and Harbor Workers' Compensation Act support the conclusion that only a defect in the vessel or in the vessel's equipment creates a duty to intervene.  Before the 1972 amendment, a longshoreman could recover from a vessel for an injury caused by the vessel's unseaworthiness.  *See, e.g.*, *Seas Shipping Co.*

- 6 -

*v. Sieracki*, 328 U.S. 85 (1946).  A vessel remained liable to an injured longshoreman even if the unseaworthiness resulted exclusively from the stevedore's negligence. *Scindia Steam*, 451 U.S. at 165.  The 1972 amendments "intended to . . . terminate [the vessel's] automatic, faultless responsibility for conditions caused by the negligence or other defaults of the stevedore."  *Scindia Steam*, 451 U.S. at 168.

Antoinette cites *Mallard v. Aluminum Co. of Canada, Ltd.*, 634 F.2d 236 (5th Cir. 1981) (Henderson, J.), to suggest that a defect not in the vessel or in the vessel's equipment can trigger the vessel's duty to intervene, but *Mallard* is not persuasive.[4] The plaintiff in *Mallard*, while unloading cargo, sustained an injury when a forklift fell through rotten plywood and onto the plaintiff.  The charterer's contract with the stevedore obligated the charterer to provide the plywood in good condition. *Mallard*, 634 F.2d at 240.  In this action, Antoinette fails to allege or to show that a contract obligated the defendants to supervise the stevedore's use of the crane.  *See Scindia Steam*, 451 U.S. at 172 ("We are of the view that absent contract provision . . . the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore.").

---------------------------

[4] Also, Antoinette argues that the "land-based negligence standard" in the Restatement (Second) of Torts defines the defendants' duty.  (Doc. 83 at 7 (citing *Mallard*, 634 F.2d at 242–43)). However, *Scindia Steam* explains that the land-based standards in the Restatement "do not furnish sure guidance in [maritime] cases." *Scindia Steam*, 451 U.S. at 168 n.14.

Viewing the facts in the light most favorable to Antoinette, no dispute of material fact appears.  Anthony Bates, a Logistec health and safety coordinator, and Alexsejs Dobnov, the captain of the M/V *Wild Lotus*, testified that the crane was in "good working condition" at the time of the accident.  (Doc. 59-1 at 28 (Dobnov); Doc. 57-2 at 9–10 (Bates); *accord* Doc. 57-1 at 13 (Miley))  Antoinette cites no testimony suggesting that the crane or the vessel's other equipment malfunctioned. Because the duty to intervene appears only with a defect in the vessel or in the vessel's equipment and because Antoinette fails to produce any evidence of a defect, the defendants are entitled to summary judgment.

Although Antoinette correctly notes that custom may establish a vessel's duty to intervene (Doc. 83 at 13–14), negligent supervision cannot establish a breach of that duty.  As noted above, only a defect in the vessel or in the vessel's equipment triggers the duty to intervene.  *Cf. Scindia Steam*, 451 U.S. at 176 ("[A]n equally necessary inquiry is whether . . . custom place[s] . . . a continuing duty on the vessel to repair defective ship's gear being used by the stevedore in the cargo operation."). Because Antoinette fails to allege or to show a defect in the vessel or in the vessel's equipment, Antoinette's reliance on custom fails to establish a dispute of material fact.

Also, Antoinette alleges that the vessel's crane lacked a warning system and that the defendants, recognizing that absence of a warning system and of a flagman, should have intervened.  (Doc. 51 at 4; Doc. 83 at 9)  As explained above, the

- 8 -

stevedore's alleged negligence in unloading the M/V *Wild Lotus* without a flagman, a header, or a radio fails to establish the defendants' duty to intervene.  The crane's lack of a warning system might support a finding of liability against the defendants, but Antoinette fails to allege or to show that the lack of a warning system rendered the crane defective from the outset, i.e. that the defendants breached the turn-over duty.

Even if Antoinette alleged a breach of the turn-over duty, the evidence shows that the defendants turned over the crane in a reasonably safe condition.  Daryl Miley, a Logistec supervisor who oversaw the unloading of the M/V *Wild Lotus*, recalled no problem with the crane.  (Doc. 57-1 at 13)  Bates said that Logistec uses a crane only if the crane works properly.  (Doc. 57-2 at 10)  Again, the conclusory statements of Bolcar and Sullivan (e.g., "the cranes being used should have been equipped with warning devices . . .") fail to establish a dispute of material fact.

## CONCLUSION

Only a defect in the vessel or in the vessel's equipment triggers a vessel's duty to intervene.  Even viewing the facts in the light most favorable to Antoinette, the record shows no defect in the vessel or in the vessel's equipment.  Because a claim of negligence requires a duty and because Antoinette fails to show a defect creating a duty to intervene, the defendants are entitled to summary judgment.  The defendants' motion (Doc. 74) for summary judgment is **GRANTED**.  The clerk is directed (1) to

enter judgment for NYK Reefers Ltd. and Cool Carriers AB and against Antoinette

Dixon, (2) to terminate all pending motions, and (3) to close the case.

ORDERED in Tampa, Florida, on September 30, 2016.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE